**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 21-CR-563 (JDB)** |
| | **:** | |
| | **:** | |
| **VICTORIA WHITE** | **:** | |


### DEFENDANT WHITE'S MOTION TO TRANSFER VENUE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

COMES NOW Defendant, Victoria White, (hereinafter "White") by undersigned counsel, and respectfully moves the Court, pursuant to Federal Rule of Criminal Procedure 21, for a transfer of venue so that he may be tried by an impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

### I.   PROCEDURAL HISTORY

This case arises out of the events at the United States Capitol on January 6, 2021(hereinafter "J6").  Defendant White is charged in a four count superseding indictment charging violations of 18 U.S.C. §§ 231(a)(3) and 2, 1752(a)(1), 1752(a)(2), and 40 U.S.C. Section 5104(e)(2)(D).  *See* ECF  No. 32.

### II.   LEGAL ARGUMENT

#### A. Federal Rule of Criminal Procedure 21(a)

The Fifth and Sixth Amendment of the United States Constitution entitle criminal defendants to a fair trial by an impartial jury. *See In re Murchison*, 349 U.S. 133, 136 (1955).  "The theory in our system of law is that conclusions to be reached in a case will

1

be induced only by evidence and argument in open court, and not by any outside influence[.]"*Patterson v. Colorado*, 205 U.S. 454, 462 (1907).  Justice Hugo Black observed that the American justice system "has always endeavored to prevent even the probability of unfairness." *Id.*  Accordingly, Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair)(*see also Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during voir dire] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory.").  "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966).

When the threatened harm is prejudice to a fair trial, a number of alternatives less restrictive of expression may be available, which include:

> (a) change of trial venue to a place less exposed to intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to

> guilt or innocence; (d) the use of emphatic and clear instructions on the sworn
> duty of each juror to decide the issues only on evidence presented in open
> court(;) (e) sequestration of jurors (to) enhance the likelihood of dissipating the
> impact of pretrial publicity and emphasize the elements of the jurors' oaths.

*In re Halkin*, 598 F.2d 176, 195, (D.C. Cir. 1979) (*citing Nebraska Press Ass'n*, 427 U.S.
at 563-64; s*ee also Sheppard,* 384 U.S. at 333).  In *Irving v. Dowd*, the Supreme Court
stated:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life. In
> the language of Lord Coke, a juror must be as "indifferent as he stands unsworne."
> Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial.
> Cf. Thompson v. City of Louisville, 362 U.S. 199. This is true, regardless of the
> heinousness of the crime charged, the apparent guilt of the offender or the station
> in life which he occupies.

*Irvin v. Dowd,* 366 U.S. 717, 722 (1961); but see *Patton v. Yount*, 467 U.S. 1025,

10311032 (1984) (distinguishing *Irvin v. Dowd's* holding on the grounds that the second

jury trial took place four years later after pretrial publicity had long subsided.)

The Court further recognized that the presumption of prejudice overrides juror

declarations of impartiality during voir dire because such attestations may be insufficient

to protect a defendant's rights in particularly charged cases.  Where pervasive pretrial

publicity has "inflamed passions in the host community" and "permeat[es] the trial

setting [such] that a defendant cannot possibly receive an impartial trial," the district

court must presume local prejudice and transfer the proceeding. *United States v.*

*QuilesOlivo*, 684 F.3d 177, 182 (1st Cir. 2012); *Cf. Mu'Min v. Virginia*, 500 U.S. 415,

429-430 (1991) (*citing Patton*, *supra*, at 1035) ("Under the constitutional standard, on the

other hand, 'the relevant question is not whether the community remembered the case,

but whether the jurors had such fixed opinions that they could not judge impartially the

guilt of the defendant.'").

When examining a Rule 21 motion to transfer venue, a court should consider (1)

the size and characteristics of the community; (2) the nature and extent of pretrial

3

publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010).  In *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally.  *Id.*  The Court in *Skilling* distinguished the facts before it from the "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice."  *Skilling v. United States*, 561 U.S. 358, 381-382, 130 S. Ct. 2896, 2915, 177 L.  Ed. 2d 619, 643, (2010).

A review of the *Skilling* factors makes apparent that the Court should transfer the Defendant's case from the District of Columbia.   Respectfully, Defendant White requests that her case be transferred 8 miles away to the United States District Court for the Eastern District of Virginia.  By doing so, the Defendant stands a significantly better chance of being tried by a truly impartial jury.  Alternatively, Defendant White asks that the Court consider transferring her case to the Northern or Eastern Districts of Texas both or which are slightly closer to her home state of Minnesota than D.C. and both, she believes, provide a better chance of obtaining a jury pool that is free of the taint of pre-trial publicity surrounding her case.  That publicity, specific to Ms. White, has been sensationalized in local news both in Minnesota and in Washington, D.C. as this motion will address.

## B. Size and Characteristics of the Community

The first *Skilling* factor to consider is the size of the population eligible for jury duty.  *Skilling*, 561 U.S. at 382 (comparing Houston's 4.5 million potential jury pool with a smaller Louisiana parish with 150,000 residents).  The District of Columbia has less than 700,000 in total population[1], but because of its more transient population, the potential jury pool is likely much smaller than a comparable federal district.[2,3]   Several January 6th Defendants, not White, commissioned a Multi-District Survey.  *See*  Exhibit A "Multi-District Study".  This extensive survey was conducted in four regions: the District of Columbia, the Middle District of Florida (Ocala Division), the Eastern District of North Carolina, and the Eastern District of Virginia. (*Id*. at p.1, f.n. 2).   While the non-D.C. test areas registered reliably similar results to each other, the survey found that D.C. respondents were an outlier and had a "decidedly negative" attitude towards J6 defendants.  (*Id*. at 2).

Shockingly, "*91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%.*"  *Id*.  A whopping 30% of D.C. residents admitted to

---

[1] This total is not broken down to those eligible for jury duty.

[2] See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545) https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearlyhttps://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decadetripledcompared-previous-decade

[3] See US Census, Quick Facts - District of Columbia, https://www.census.gov/quickfacts/DC (last visited March 28, 2022)

making every prejudicial prejudgment, double the rate of the next highest area.  *Id*.



*Figure 1*

A significant finding in the survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of J6.   Respondents were asked: Have you experienced increased concern about your own safety or the safety of people important to you due to the events of January 6th?  The difference between the D.C. and the other areas is astounding:



<em>Figure 2</em>

The survey included four questions as to the personal impact J6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia.  (*See* Ex. A at 4).

   As the Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four months after the J6.[4]  Mayor Bowser declared a state of emergency and implemented a 6 p.m. curfew for weeks subsequent to J6.  The District implemented significant road and public space closures in direct response to J6.[5] The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists who were allegedly emboldened by the "mob assault" on the Capitol.[6]  Additionally, nearly 15,000 individuals work

---

[4] See National Guard troops leave US Capitol more than 4 months after January 6th riot, FOX5 Washington DC, https://www.fox5dc.com/news/national-guard-troops-leave-us-capitolmorethan-4-months-after-january-6th-riot (last visited March 28, 2022

[5] DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosuresthreatsnational-mall/2542719/ (last visited March 28, 2022).

[6] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent-domestic- extremists (last visited March 28, 2022).

for Congress directly, and many more D.C. residents have friends and family who work on the Hill.[7]  Finally, many D.C. residents have friends and family employed by law enforcement groups who took part in responding to J6.[8]  The majority of potential jurors in the District of Columbia were personally impacted in some way by the events on Capitol Hill on J6.  *See* Ex. A at 4.  This factor weighs heavily in favor of transferring the instant cases to the Eastern District of Virginia or some other District.  D.C. is a city that, as a whole, feels that it has been the victim of a crime because of the events of J6.  J6 was a substantially more impactful event than Enron's collapse, which personally affected a few hundred families in city of 4.5 million residents, who could easily be stricken from the jury pool.

## C. Nature and Extent of Pretrial Publicity

The next *Skilling* factor pertained to the adverse publicity against the former Enron executive.  *Skilling*, 561 U.S. at 382 ("Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.).  The nature and extent of pretrial publicity related to the events of J6 weigh heavily in favor of transferring venue.  District residents have been exposed to thousands of comments from local and national leaders regarding J6, related arrests, criminal charges, Congressional hearings and, prosecutorial outcomes.  Unlike the Enron prosecution, J6 is an ongoing event, with prosecutors still continuing to charge defendants.  The negative publicity loop never stops, whereas in *Skilling*, four years went by before the trial took place, with the negative publicity finally ending.   Here, negative press coverage is guaranteed to continue for a long time.  The House Select Committee to Investigate

---

[7] Vital Statistics on Congress, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5- Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[8] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. Human Capital Strategic Plan 2021- 2025,U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20H uman%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals areemployed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. See Metropolitan Police Force Annual Report 2020, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowr es_a.pdf

the January 6th Attack on the United States, but its very name has prejudged the outcome of the fate of many defendants.  The report of this committee, released in December of 2022, is available online.  With Chapters like "The Big Lie" and "Analysis of the Attack", the chance that defendants can escape the one sided nature of the publicity surrounding the committee's sensationalized hearings and final recommendations is unlikely.

The January 6 Select Committee, nearly a year before the investigation was finished, released a number of public statements about alleged  "insurrectionists," "white supremacists," and "domestic terrorists."[9] Speaker Pelosi went so far as to declare that Donald Trump was an accessory to murder.[10] (*See* Section 3 below for additional citations).  Respectfully, White does not agree that J6 was an "act of domestic terror," "a white supremacist attack," or an "insurrection" on her part. In fact, unlike D.C. residents, most Americans, as the three attached surveys show, believe that J6 was a very large protest that got out of hand and turned into a riot by a select few that were there.  One of the Capitol policeman, Aquilino Gonell, wrote a guest essay in the New York Times on July 11, 2022, describing how President Trump and his followers beat him on January 6 as he defended "our democracy." He was then highlighted in the J6 hearing July 12, 2022 by Jamie Raskin. This type of inflammatory press continues to have unknown adverse effects on defendants like Ms. White.

https://www.nytimes.com/2022/07/10/opinion/capitol-police-jan-6.html.

The Multi-District Study asked respondents four questions related to news coverage in the tested areas.  The survey revealed that D.C. is an outlier when it comes to saturation coverage.  Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia.  (Ex. A,

---

[9] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

[10] *Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murde*r, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-thecapitolhttp://www.msnbc.com/watch/nancy-pelosi-on-thecapitol-hill-insurrection-hillinsurrection- trump-was-an-accessory-to-the-crime-of-murder-99705925960 (last visited March 28, 2022).

fig. 6).  D.C. residents have been inundated with one-sided coverage of the events surrounding J6, are surrounded by residents who feel personally impacted by J6, and clearly have been jaundiced towards the Defendants.  The survey demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in J6 as compared to their D.C. counterparts many of whom, according to the study, are closely following J6 coverage.

### D.  Proximity of Publicity to Trial

The *Skilling* Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  Again, this factor weighs heavily in favor of relocating the trial from D.C.  The ongoing negative publicity generated by the House Select Committee Hearings creates presumed prejudice for defendant White.  In fact, White respectfully submits that requiring her to go to trial in the District in the dark shadow of the Select Committee's investigation and recommendations would be highly prejudicial.  The Court of Appeals for the First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952).  In *Delaney*, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant.  *Id*. at 114.  The *Delaney* Court ruled that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.

*Id*. at 114.

The Court of Appeals for the District of Columbia dealt with a similar issue during Watergate.  Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge.  Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because it was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United* States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity requires the Court to either grant a lengthy continuance or transfer of venue to a federal district that is not satiated by the Select Committee's work.  The instant case is far worse than *Delaney* and *Ehrlichman*.  On top of the Select Committee hearings and subsequent report findings, J6 is reported on every day in local news channels and in newspapers online and in print. The two-year anniversary of the event, as well as recent sentencings of high-profile J6 defendants, have kept the matter in the forefront of local discourse. Former President Trump's announcement of his presidential campaign, the impact of the committee report and recommendations, and the political fallout all this has, cannot be underestimated.  Indeed, the J6 committee recommendations labeling Trump as a "central cause" of the attack on the Capitol and making criminal charge referrals against him only serves to create an aura of suspicion in the minds of potential D.C. jurors about the role Ms. White and others played in the events that day.

Last N, former Vice November former Vice President Pence was on the ABC nightly news broadcast in prime-time talking to David Muir about the events of  January 6th.[11]

---

[11] *Pence to Muir: Trump's words on 1/6 'endangered me and my family and everyone at the Capitol'*, ABC News, Nov. 13, 2022, https://abcnews.go.com/Politics/mike-pence-tells-david-muir-trumps-jan-words/story?id=93225045



**Pence to Muir: Trump's words on 1/6 'endangered me and my family and everyone at the Capitol'**

"It was clear he decided to be part of the problem."

By Tal Axelrod
November 13, 2022, 6:01 PM

Share

Pence says Trump's words were 'reckless' on Jan. 6

*Figure 3*

The broadcast showcased images of violence sensationalized for the American audience and designed to create the impression that the Trump supporters were there to attack Pence that day. The Washington Post ran a story on the Pence interview with images of police lines and tear gas (*See* figure 4) stating that "[F]ive people died in or as a result of the Jan. 6 attack, and about 140 police officers were assaulted when a pro-Trump mob stormed the U.S. Capitol, breaking through security barriers and forcing lawmakers and aides to barricade themselves inside their offices as they feared for their lives."[12]

---

[12] *Pence escalates criticism of Trump's Jan. 6 actions, calling him 'reckless'*, The Washington Post, Nov, 14, 2022, https://www.washingtonpost.com/politics/2022/11/14/pence-trump-reckless-remarks-jan-6/



Police stand guard after holding off rioters who tried to break through a barrier at the U.S. Capitol in Washington on Jan. 6, 2021. (Julio Cortez/AP)

*Figure 4*

On January 7, 2021 Rep. Bennie Thompson (D-MS), now the Chairman of the  Select

Committee to Investigate the J6, stated in an official statement, that

> [w]hat occurred yesterday at our nation's Capitol was – pure and simple –  domestic
> terrorism incited by President Trump, his enablers, and those seeking to overturn the
> results of a legitimate election. January 6, 2021 will go down in history as the date
> that an angry mob of domestic terrorists and insurrectionists illegally tried to
> prevent our elected representatives from fulfilling their constitutional duty in the
> orderly transfer of power. It was a sad day for our democracy[.][13]

On July 21, 2021 Speaker Pelosi released her statement on Republican recommendations to

serve on the House Select Committee to Investigate the January 6th Attack on the United States

Capitol.[14]  In the Speaker's statement, without any due process beforehand, she pronounced

---

[13] *The Hon. Bennie Thompson's Official Statement:*
https://homeland.house.gov/news/pressreleases/chairman-thompson-statement-on-domestic-terroristhttps://homeland.house.gov/news/press-releases/chairman-thompson-statement-on-domestic-terrorist-attack-on-capitolattack-on-capitol

[14] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

definitively that "January 6th [was an] "Insurrection" and authorized the Select Committee to "investigate and report upon the facts and causes of the *terrorist mob attack."* The Select Committee has also provided information it obtained through its contemporaneous investigation on an individual named Ray Epps, before the Department of Justice made any specific production to any defendants.[15]  On April 8, 2022 it was reported that:

> The House Select Committee Investigating the violent breach of the U.S.
>  Capitol building on January 6, 2021, has reportedly uncovered evidence that
> shows that there was coordination between two white supremacist militias during
> that event — and that those militias may have also coordinated with organizers of
> the "Stop the Steal" rally that proceeded the attack on Congress.[16]

And the *New York Times* has reported that "[t]he House committee investigating the Jan. 6 attack on the Capitol said on Wednesday that there was enough evidence to conclude that former President Donald J. Trump and some of his allies might have conspired to commit fraud and obstruction by misleading Americans about the outcome of the 2020 election and attempting to overturn the result." [17]  The Select Committee's one-sided perspective on the events of J6 has caused significant prejudice for the Defendant and these statements, released before a full investigation had even been concluded, demonstrate the political nature of the investigation rather than a true attempt to seek truth for the American people.

Likewise, multiple statements made by Attorney General Merrick Garland have tainted the District of Columbia's jury pool.  General Garland, for instance, has repeatedly compared J6 to  the

---

[15] After senators brought Epps up in a hearing, a Jan. 6 committee spokesperson released a statement last week, saying Epps "informed us that he was not employed by, working with, or acting at the direction of any law enforcement agency on January 5th or 6th or at any other time and that he has never been an informant for the FBI or any other law enforcement agency."  Select committee member Rep. Adam Kinzinger, an Illinois Republican, said that Epps "didn't enter the Capitol on Jan. 6 and was removed from the most wanted list because, apparently, he broke no laws."
[16] Report: Jan. 6 Committee Finds Connections Between Militias & Rally Organizers By Chris Walker, TruthOUT.com April 8, 2022 https://truthout.org/articles/report-jan-6-committeehttps://truthout.org/articles/report-jan-6-committee-finds-connections-between-militias-rally-organizers/findsconnections-between-militias-rally-organizers/ (emphasis added).
[17] *Jan. 6 Committee Lays Out Potential Criminal Charges Against Trump* By Luke Broadwater and Alan Feuer, New York Times, March 2, 2022,
https://www.nytimes.com/2022/03/02/us/politics/trump-criminal-charges-jan-6.html

Oklahoma City bombing case, alleging at his confirmation hearing that "there was a line that

connected the January insurrection to the Oklahoma City bombing and back to the battles of the

original Justice Department against the Ku Klux Klan."[18]  In a June speech to DOJ officials, the

Attorney General "compared the 1995 Oklahoma City bombing to the Capitol riot of January 6

when unveiling the Justice Department's response to the Biden Administration's new anti-domestic

terrorism strategy."[19]  The Attorney General's repeated comparisons of the Oklahoma City

bombing to J6 is particularly relevant to this motion as the Attorney General, a senior DOJ official

at the time, supervised the prosecution of Timothy McVeigh and his co-conspirators.[20]  During his

prosecutorial leadership, Garland agreed with defense attorneys that the Eastern District of

Oklahoma could not provide the Oklahoma City defendants a fair trial, and consented to a transfer

of venue.  *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla 1996) ("There is no

disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The

effects of the explosion on that community are so profound and pervasive that no detailed

discussion of the evidence is necessary.").[21]  *A priori*, if the events of J6 are comparable to the

Oklahoma City case in the opinion of the Attorney General, who in 1995 agreed to a transfer of

---

[18] Zoe Tillman, *Merrick Garland pledged to investigate the Capitol insurrection*, Buzzfeed (Jun. 15, 2021), https://www.buzzfeednews.com/article/zoetillman/merrick-garlandinvestigate-capitol-riotshttps://www.buzzfeednews.com/article/zoetillman/merrick-garland-investigate-capitol-riots-attorney-generalattorney-general.  See also (AG Garland speech on combatting domestic terrorism) (Jun. 15, 2021), https://www.youtube.com/watch?v=6-_loIzn5Bo (Jun. 15, 2021).

[19] Jerry Dunleavy, *Merrick Garland ties Oklahoma City bombing to Capitol Riot*, Wash. Examiner (Jun. 15, 2021), https://www.washingtonexaminer.com/news/garland-oklahomacity-bombing-capitol-riot.

[20] Wash. Post (Feb. 21, 2021) (video of testimony of AG confirmation hearing), https://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-dangerousperiodhttps://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-dangerous-period-than-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01-b07e-6b937d75b3d8_video.htmlthan-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01b07e-6b937d75b3d8_video.html.  See also Dana Milbank, *Merrick Garland lets domestic terrorists know there's a new sheriff in town*, Wash. Post (Feb. 22, 2021) ("Garland  prosecuted the Oklahoma City bombing perpetrators before becoming a federal judge[.]").

[21] The Government's suggestion that McVeigh prosecutors agreed to transfer the case from Oklahoma City because the "federal courthouse was itself damaged during the bombing" is not accurate.  The McVeigh court clearly indicated that the Government agreed that McVeigh's ability to receive a fair trial in Oklahoma City was "chancy."  McVeigh, 918 F. Supp. at 1470.

venue in the latter case, logically a comparable transfer of venue in the instant case would comport with consistent treatment of defendants.

### E. Presumed Prejudice

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was lacking in that case.

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383.

Unlike the defendants in *Skilling*, to date, all of the J6 trials before juries have resulted in almost unanimous jury verdicts promptly returned against the defendants:  The first trial summary, according to the *N.Y. Post*: "[T]he first jury trial for a Capitol protestor from January 6, 2021 led to Guy Reffitt, a 49-year-old member of the  "Texas Three Percenters" militia group, was found guilty on all five of the felony charges he faced, including bringing a gun onto the Capitol grounds and obstructing an official proceeding.  A federal jury in Washington, DC, handed down the unanimous verdict against Reffitt after just two hours of deliberation."  *See*  "Guy Reffitt found guilty in first Capitol riot trial, By Emily Crane and Jorge Fitz-Gibbon, New York Post, March 8, 2022," https://nypost.com/2022/03/08/guy-reffitt-found-guilty-in-first-capitolriot-trial.

On April 14, 2022, "[a]fter less than three hours of deliberations, a Washington, D.C., jury found Dustin Thompson guilty of multiple charges stemming from his participation in the January 6, 2021, Capitol assault, including obstructing Congress' certification of the Electoral College votes and stealing liquor and a coat rack from the Capitol building.  He likely faces a maximum sentence of 20 years in prison." *See* Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts,  CBSNews, By Robert Legare, April 14, 2022 [Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts - CBS News.](#)

Every other case that's gone to jury trial has resulted in a guilty verdict. *See  U.S. v. Cusanelli.* 21 CR 37(TNM)*; U.S. v. Robertson,*  21 CR 34 (CRC);  *U.S. v. Griffin,* 21 CR 92(TNM);  *U.S. v. Williams,* 21 CR 377 (BAH), and *U.S. v. Strand*, 21 CR 85 (CRC).

a. **The Multi-District Study**

The Multi-District Study found that while the tested areas differ from each other in geographic location, demographic composition and political party alignment, the non-D.C. areas produced reliably similar results to each other on most questions in the survey, with the D.C. standing apart. *See* Ex. A at 2..  Notably, the Eastern District of Virginia is consistently more in line with North Carolina and Florida than the District:

> "Q3. 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.
>
> •      Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.
>
> •      Q6. 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.
>
> •      Q9. Over 40% of the DC Community stated they believe all the Events of January 6th were <u>racially</u> motivated, even when offered options to reserve judgment on that question. (Emphasis added) The median in the Study was 20%.

Also noteworthy are the results on preconceived beliefs that the J6 defendants preplanned to go into the Capitol:



*Figure 5*

(Exh. A, fig. 1).  Well over the majority, 71% of D.C. residents believe that J6 was preplanned, whereas discovery has produced no evidence that the Defendant planned the Capitol breach or even planned to march to the Capitol that day.  This result is significant on the issue of intent, which is an essential element of a number of the charges.   The Defendant would face a jury in the District of Columbia that overwhelming doubts her major defense, i.e., that there was no preplanning on her part to march to the Capitol and participate in a civil disorder of any kind.

The Multi-District survey also confirms substantial bias in D.C.'s potential jury pool:



*Figure 6*

(Exh. A, fig. 2).  Again, this survey shows the significant percentage with which the District of

Columbia surpasses the three other jurisdictions by well beyond the margin of error:

> This bias is not only more prevalent in the DC Community, but it is also more
> intense. The DC Community also admits making more than one prejudicial
> prejudgment at a much higher rate than respondents from the other Test Areas. In
> fact, 30% of DC Community respondents admit that they have already made every
> prejudicial prejudgment tested for in the survey – double the rate of the next highest
> Test Area.

(Ex. A at p. 2).

**b. <u>Analysis by the Federal Public Defenders' Office</u>:**

Significant majorities of potential jurors in DC have prejudged the January 6 defendants.

The D.C. Federal Defender's Office (the "PD Survey") commissioned a survey of potential jurors.

The PD Survey shows that a significant percentage of D.C.'s potential jurors harbor negative

attitudes of J6 defendants and have already concluded that they are guilty.  (Case No. 1:21-

cr00024-EGS, ECF 101-1, Select Litigation Report commissioned for the PD, D.C., with

appendices), and hereby incorporated for these Defendants.   (Attached hereto as Exhibit  B).

The PD Survey polled 400 potential D.C. jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia, similar in a few factors to the District of Columbia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6.  *See* Ex. B.  The PD Survey found that most District of Columbia residents prejudged the defendants as generally "guilty" and prejudged the element essential to intent. *Id.* at  ¶¶14, 10, 15, 18.   Significant majorities in the District would characterize J6 protestors as "criminals" (62%) and have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%).  *Id.* at ¶¶ 14, 10.

Typically, one would expect most respondents to reserve judgement on guilt or innocence. Yet over half of the District's survey respondents were willing to admit that they are more likely to vote "guilty" if they find themselves on a jury in a J6 case (52%).  *Id.*  at ¶ 1.  And potential D.C. jurors (85%) believe that J6 protestors were "insurrectionists" (72%) and entered the Capitol to try "to overturn the election and keep Donald Trump in power."  *Id.* at ¶ 15, 18.  Those surveyed have prejudged these key elements of the Defendant's central defenses.  In the PD Survey, in reviewing the same questions asked of 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, significantly fewer potential jurors have the bias against January 6th defendants when compared to the District of Columbia. *Id.* at ¶ 19-23.

**c. <u>Analysis by Zogby Polling Co.</u>**

One J6 Defendant, Garcia, filed a Motion to Transfer Venue and attached a Survey for the District of Columbia by Zogby, Inc., a well-regarded polling company.  (Case 1:21-cr00129-ABJ, ECF 54-1 Filed 02/01/22, attached hereto as Exhibit C).   This survey polled 400 D.C. residents in January of 2022.  The Zogby poll and *Garcia* filing is hereby incorporated into this filing.  The Zogby poll found that:

--88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder;

--73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;

--A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for other protestors' violence and destruction of property;

--70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

The findings on the Multi-District Study show results that are in line with both the PD and Zogby surveys showing evidence of prejudgment bias as to overall guilt and on the element of intent, even when compared with the closest neighboring jurisdiction, the Eastern District of Virginia.

In *Skilling*, Justice Sotomayor, J. wrote,

I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron's onetime chief executive officer (CEO, Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of venue, they required the District Court to conduct a thorough voir dire in which prospective jurors' attitudes about the case were closely scrutinized. The District Court's inquiry lacked the necessary thoroughness and left serious doubts about whether the jury empaneled to decide Skilling's case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom. Accordingly, I would grant Skilling relief on his fair-trial claim.

*Skilling*, 561 U.S. at 427.  (Justice Sotomayor, J. concurring in part and dissenting in part).

### d. Alternate Venues

Venue transfer is proper under Rule 21(b) for convenience. Federal Rule of Criminal Procedure 21(b), which allows for venue transfer "for convenience," provides that, "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against the defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest

of justice." When enacted, "the draftsmen of Rule 21(b) sought a provision that would ensure some degree of equality between prosecution and defense in choice of forum." Assessment on Transfer Motion of Jury Bias in Transferee District Held Abuse of Discretion Remediable by Mandamus, 63 COLUM. L.REV. 1324,

Ms. White cannot obtain a trial by an impartial jury in the District of Columbia because seating an impartial jury is impossible under the current tainted environment and given the sensationalized media coverage of the particular facts of her case.  As the news has widely reported, Ms. White was the victim of a beating at the hands of The Metropolitan Police Department (MPD) on January 6th.[22]   Images of the multiple police dragging Ms. White through the Capitol, screaming in pain and bloody, as seen in figure 7 below, accompany almost every story that mentions her case. (Figure 7 https://yournews.com/2023/02/08/2510189/victoria-white-beaten-by-police-with-metal-baton-on-head/ ).

Victoria White, Beaten by Police With Metal Baton on Head on Jan. 6, to Decline Plea Deal

Feb 8, 2023



*Figure 7*

This is the very police department the citizens of the District of Columbia rely upon for security and enforcement in their community.  The beating Ms. White suffered at the hands of

---

[22] *See,* https://www.worldtribune.com/attorney-video-shows-police-attacking-trump-supporter-victoria-white-on-jan-6/ and
https://www.ntd.com/prosecutors-identify-police-supervisor-who-beat-woman-on-jan-6_834030.html

MPD Officers will be a central issue at trial and will thus make the facts of the case personal to every citizen in the District of Columbia who relies on the MPD for protection and policing.  Even robust voir dire of the jurors cannot remedy the prejudice the jurors will harbor when faced with putting their own police department under a microscope.   It may be impossible to find a juror who has not had some interaction with MPD officers, either good or bad.  The sensationalized pictures that had already been shown to prospective jurors cannot be unseen and with the trial approaching these images will be everywhere.  Even Ms. White's status hearing earlier this month was attended by multiple news media outlets and multiple stories were written and broadcast about the case, all mentioning the beating, most showing images from body worn camera of her assault, and one even incorrectly reporting that she was in D.C.for her trial.[23]

Ms. White submits that the Eastern District of Virginia or some other District, specifically the Northern or Eastern Districts of Texas, would be appropriate alternative venues.  The Eastern District of Virginia in Alexandria is just over 8 miles away from the federal courthouse in D.C.  Although a short distance from the District of Columbia, the Eastern District of Virginia offers potential jurors shown by sound studies to be significantly less biased.  This change of venue would result in very little inconvenience for the Court and the parties and would actually be a more convenient (and safer) location for many other participants in the trial.  Moreover, the Court would avoid the very distinct risk of having to potentially try the instant cases twice, as multiple surveys provide documented proof that substantial prejudice exists in D.C.'s jury pool, and case law suggests that a highly publicized congressional report generating negative headlines against the J6 participants *during their trial* could be grounds for a mistrial or a new trial on appeal.

---

[23] "DOJ sought to Jail Han 6 Defendant and Police Beating Victim Victoria White for Meeting with Lawmakers on Captiol Hill" https://yournews.com/2023/02/13/2512516/doj-sought-to-jail-jan-6-defendant-and-police-beating/  and Gateway Pundit, Feb. 7, 2023
"J6 Defendant Victoria White – Who Was Pummeled in Face by Police with Their Bare Fists and Batons over 40 Times on Janaury 6 – Arrives in DC for Upcoming Trial This Week" https://www.thegatewaypundit.com/2023/02/j6-defendant-victoria-white-pummeled-face-police-bare-fists-batons-40-times-january-6-arrives-dc-upcoming-trial-week/

Alternatively, The Eastern and Northern Districts of Texas offer a venue choice that would bring some sense of equality between the prosecution and the defense in choice of forum.   Defense counsel resides part of the year in Plano, Texas which is located in the Eastern District of Texas and is only a 30 minute drive from the Northern District of Texas.  Counsel has an office available for purposes of trial in either the Eastern or Northern Districts.

Ms. White, however, lives in Rochester, Minnesota.   A trial in the District of Columbia requires her to drive over 1100 miles.  Alternatively, the drive to Dallas, Texas is about 900 miles from Rochester, Minnesota.  The defense recognizes that many of the witnesses for this case will reside in or near the District of Columbia, but with modern technology, many could testify remotely if the trial were held elsewhere.  Additionally, almost all of Ms. White's witnesses and family support system reside in Minnesota or surrounding areas and a trial in Texas would be slightly closer and just as convenient for these witnesses and Ms. White's family. *See United States v. Radley*, 558 F. Supp. 2d 865, 877 (N.D. Ill. 2008) (finding transfer appropriate in part because it would be more convenient for defendants and their families); *United States v. Aronoff*, 463 F. Supp. 454 (S.D.N.Y. 1978) (granting transfer in part because denying it would deny the defendant support from his family and friends); cf. *United States v. Stanko*, 528 F.3d 581, 586 (8th Cir. 2008) (noting that, when weighing the convenience to the defendant of a Rule 18 intra-district transfer, the Court should also consider the ability of family, friends, and other supporters to attend the trial, and holding that defendant was prejudiced by "trial approximately 200 miles further than the nearest location permitted for such a trial"). Thus, this factor favors trial in the Eastern or Northern Districts of Texas.

Under similar circumstances, district courts have heavily weighed the expense imposed upon indigent defendants in favor of a transfer, noting that transfer is appropriate where the defendant cannot afford to travel to a different district and remain there during there during trial. *United States v. Hanley*, No. 94 CRIM. 394 (DAB), 1995 WL 60019, at *3 (S.D.N.Y. Feb. 10,

1995); see also *United States v. Radley*, 558 F. Supp. 2d at 882 (while recognizing the expense to the government of transporting witnesses to an alternative forum, "[o]n the whole, the Court finds this factor supports transfer because defendants do not have the same resources to support an extended trial in Chicago"); *United States v. Ferguson*, 432 F. Supp. 2d 559, 567 (E.D. Va. 2006) (rejecting government argument that transfer would be expensive, and finding that expense to defendants' weighed in favor of transfer to their home district, because "the United States of America has, for all practical purposes, unlimited financial resources to bring to bear. Unlike the [defendants], the Government can, and does, mint money."). Ms. White is indigent for purposes of representation before this Court, and the travel expenses and lodging expenses for a week or more stay in D.C., a prime tourist area, is a tremendous hardship.  Therefore, this factor strongly supports a transfer to a venue closer to Defendant's home and in a city where the hotels are less expensive.

While pretrial publicity of the Capitol riot exists in other areas of the country, the personal impact J6 had on District residents and their families requires a transfer.  The District of Columbia is further shown to have over 66% as personally impacted by a "fear of personal safety."  The District of Columbia's jury pool is saturated with prejudice.  Moreover, the notion that more than 4 out of 10 jurors would assume that J6 was "racially motivated" is disturbing and incorrect.  The J6 Defendants should not have to prove that they are not racists, but this evidence clearly shows that's what they would have to do.

The constant media coverage of the events of J6 only add to the prejudicial exposure for Ms. White and similarly situated defendants.  The country has been saturated with the narrative that "democracy is on the brink" because of the events of January 6th and that Americans should hold Trump and his supporters accountable.[24]   The Washington Post

---

[24] Full Transcript of President Biden's Speech on Democracy, New York Times, Nov. 2, 2022, https://www.nytimes.com/2022/11/02/us/politics/transcript-biden-speech-democracy.html,; and Democracy is at stake in the midterms.  The media must convey that.  Washington Post, May 15, 2022, https://www.washingtonpost.com/media/2022/05/15/democracy-midterms-vote-integrity-media-coverage/.

continues to keep that narrative and January 6 in the news for District residents on an almost daily basis.  In a Washington Post story entitled *'Democracy is fragile,' prosecutor says at close of Oath Keepers trial*, Assistant U.S. Attorney Kathryn Rakoczy was quoted as saying "[o]ur democracy is fragile" and "[i]t cannot exist without the rule of law, and it cannot survive if people who are dissatisfied with the result of an election can use force and violence to change the outcome.".[25]

Ms. White, who was non-violent at the Capitol on January 6, cannot overcome the powerful influence the media has on District residents potentially destined for her jury pool.  And as long as the local media continues to paint January 6 defendants as a threat to democracy, Ms. White cannot obtain a fair and impartial jury.

---

[25] Wash. Post (Nov. 18, 2022) '*Democracy is fragile.' Prosecutor says at close of Oath Keepers trial*,https://www.washingtonpost.com/dc-md-va/2022/09/29/oathkeepers-jury-seated/

III.     **CONCLUSION**

Based on the foregoing, Ms. White has demonstrated that she faces significant, irreversible prejudice in the District of Columbia and will be unable to have a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.   Accordingly, Ms. White requests that this Court transfer the venue to the Eastern District of Virginia or some other District, preferably the Eastern or Northern Districts of Texas, pursuant to Fed. R.Crim.P. 21(a).


Respectfully Submitted,


By: Nicole Cubbage


_____/s/_____
Nicole Cubbage
DC Bar No. 999203
712 H. Street N.E., Unit 570
Washington, D.C.  20002
703-209-4546
cubbagelaw@gmail.com
Attorney for Victoria White

<u>Certificate of Service</u>

I certify that a copy of the forgoing was filed electronically on ECF for all parties of record on this 24th day of February, 2023.

_____/s/_____

Nicole Cubbage

Attorney for Victoria White