**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-563 (JDB)** |
| **VICTORIA CHARITY WHITE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Victoria White ("White") to four months' incarceration, within the applicable advisory Guidelines range, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.  INTRODUCTION

White, a 41-year old receptionist from Minnesota, participated in the January 6, 2021 attack on the United States Capitol.  At approximately 3:30 p.m., White joined a riotous mob on the west side of the Capitol building.  As she pushed through the crowd on the Lower West Terrace, she moved toward the Lower West Terrace Tunnel, where dozens of law enforcement officers were beaten and assaulted by the mob for hours as they protected the entrance to the Capitol.  As White approached the Tunnel, she observed rioters wearing protective gear, wielding weapons, shouting, and fighting.  She looked on as objects such as flag poles and riot shields were pushed into the Tunnel to be used against the police officers inside.  Yet she was not deterred.

White continued to forcefully push through the crowd with the unmistakable objective of

1

entering the violent fray in the Tunnel.  As she moved towards her goal, she hoisted another rioter up and over the crowd - cheering as he swung himself from the Tunnel's archway and used his feet to kick at the officers inside.  White eventually succeeded in forcing her way through the Tunnel, ultimately standing directly in front of the police line. She was taken into custody, booked by United States Capitol Police, and released later that night.  Almost immediately after her release, White began to make statements on social media in which she expressed pride for taking part in the riot, and she blamed police for using force against the rioters.  To this day, she has expressed no remorse for her actions on January 6.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 82, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### White's Role in the January 6, 2021 Attack on the Capitol

In the early morning hours of January 6, 2021, Victoria White boarded a metro train in Washington D.C. and travelled to the Ellipse to attend a rally with one of her daughters and other friends.  White wore a dark colored winter jacket over a red sweater and a red baseball cap with the slogan, "Make America Great Again" printed in white letters.





*Images 1 and 2: White (yellow circle) and companions travelling to and attending a rally at the Ellipse on January 6, 2021.*

After attending the rally, White began to march toward the U.S. Capitol with other people in her group.  In later interviews, White stated that she ultimately abandoned those people as they decided to stop walking toward the building and she wanted to continue.



*Image 3: White walked with a crowd toward the U.S. Capitol.*

White arrived from the West, passing the outer western perimeter into the restricted grounds.  She joined a large group of people scaling a wall – and eventually climbed up the wall herself.  From White's vantage point, she could see thousands of people occupying the grounds of the Capitol and specifically moving toward the building itself.  She also observed rioters climbing the temporary scaffolding that had been erected for the inauguration proceedings, and would have had a view of the Lower West Terrace and Tunnel area that she would occupy in short order.





*Images 4 and 5: White observed a crowd standing on a wall and climbed onto the wall where she observed people standing on scaffolding.*

White approached the Lower West Terrace shortly before 4:00 p.m., when the area was occupied by large crowds and the Tunnel was swarmed with rioters.  As White pushed her way through the crowd towards the Tunnel, she had an altercation with a man attempting to break a window.  The man was wearing a brown sweatshirt and a green helmet with a "Trump" sticker displayed on the back.  An opensource video depicted the man approach a window on the Lower

West Terrance and begin smashing at it with a short brown bat.  Multiple people from the crowd

intervened to stop the man, including White, who grabbed the man and wrestled with him.



*Images 6 and 7: White intervened to stop another rioter from breaking a window.*

Despite seeing the damage inflicted on the Capitol building by another rioter, however,

White continued to make her way through the crowd, and toward the Lower West Terrace Tunnel.



*Image 8: White pushed her way through the mob to the Tunnel entrance.*

As White made her way through the crowd, it was apparent that the rioters at the Tunnel's entrance were using physical force to enter. White watched as multiple rioters used various weapons against the officers in the Tunnel, including a flagpole and a riot shield. The crowd eventually began heaving in unison against the police officers – moving as a wave in an attempt to overwhelm the officers with their combined physical force. White reacted by cheering on the rioters and lifting her arms.





***Images 9 and 10: White cheering as rioters pushed in unison against the police line.***

Despite observing the violence, White continued to push forward through the crowd.  As

she neared the Tunnel, she boosted another rioter up, over the crowd and pushed him toward the Tunnel entrance.  Upon receiving a boost from White, the man—depicted in blue jeans and a dark hooded sweatshirt in the images below—latched onto the Tunnel's archway, and used his boots to kick at the police officers in the Tunnel.





***Images 11 and 12: White helped to hoist a rioter onto the Tunnel arch, where he then swung and kicked at police.***

### *White's Entry into the Tunnel*

After assisting other rioters into the Tunnel, White continued to consciously move her way closer to the area. She was not deterred by the large crowd at the entrance, nor the obvious signs that she should turn back, such as the sounds of sirens and fighting coming from within, nor the open targeted violence directed at the Tunnel's entrance.



*Image 13: White continued to move toward the Tunnel's entrance.*

White was so adamant to move forward into the area that she physically squeezed herself in among a group of people – losing her jacket, her hat, the flag tied around her shoulders, and even her shoes in the process.

By approximately 4:05 p.m., White had reached the entrance of the Tunnel, where the battle between rioters and the officers was raging.  Footage recorded by the officers' body worn cameras shows that, at this point, the officers were crammed shoulder to shoulder inside the Tunnel, and that the rioters were screaming threats and assaulting them with a barrage of insults, weapons, and physical attacks.  Sirens were blaring.  Both police and protesters were deploying chemical sprays which concentrated heavily within the Tunnel itself, making it wet, sticky, and painful to breath and see.  Despite this, White continued to move herself forward into the Tunnel.



*Image 14: White pushed her way to the mouth of the Tunnel.*

By approximately 4:06 p.m., White had a full view of the entrance of the Tunnel and could plainly see that it was packed wall-to-wall with police officers, most of whom were wearing riot gear and holding shields.  Still, White tried to find a way inside.  She entered the tunnel at an angle, coming in on to the side.



*Image 15: White found her way into the Tunnel on the side.*

At no point during the video does White appear to hesitate or attempt to turn back, despite having the ability and the space to do so.  Rather, she continued to focus on going forward.  White successfully forced herself past the initial line of officers at the mouth of the Tunnel, only to find herself confronted with dozens more officers inside.  Once she reached this point, White pushed against the walls, the officers, and their shields, another officer used a baton to get her to stop.





***Images 16 and 17: White pushed herself through the Tunnel until she was immediately facing the police line.***

White was in the Tunnel for approximately five minutes.  Due to her insistence on entering the area, and refusal to turn around and leave, officers ultimately had to physically pull White through the to the other side, into the building itself.



***Image 18: White impeded police officers to such a degree that she was removed by police.***

13

*White's Social Media*

On January 7, White began posting on social media and giving interviews about her involvement in the riot.  In her statements, White painted herself as both a victim and a hero.  For example, using the pseudonym "Janice Evans," White posted on Facebook that she was "maced, Beat with metal baton, and detained by capitol police yesterday." [sic].



*Image 19*

A few hours later, in another post, White portrayed herself in a heroic light as "taking down antifa."



*Image 20[1]*

---

[1] The referenced video, showed the actions depicted in Images 6 and 7.

In yet another Facebook post that day, White celebrated her defiance of law enforcement: "I'm not scared i was in the capitol DETAINED and they took my social security # name address they are coming for me.  I am not afraid of them or anyone!!"



*Image 21*

### White's Interviews

After January 6, White gave several interviews to the media, discussed the events of January 6 on livestreams, and posted from her personal social media accounts.  In at least one of the interviews, White falsely characterized the riot as "peaceful," stating, "Most of the people, everyone is just packed together, they're peaceful in the sense of they're not burning anything down, they're not rioting.  They're just sardined in there though."

In later interviews, White made many statements about her time in the Tunnel, ignoring the violence inflicted by the rioters upon the police officers, and emphasizing repeatedly that she was beaten with a metal baton by police.  In a statement made shortly after January 6, she tried to justify her actions in the Tunnel, explaining that she was "angry" because "Pence didn't do what he's supposed to do."

> There's some police there or some kind of guards, uh I'm thinking one or two, and they're just blocking the door and they're pepper spraying. So I'm like, I'm angry in the sense that, ya know Pence

15

> didn't do what he's supposed to. I don't care. If you claim that
> you're a Christian, but you don't want to uphold justice and the fact
> that this was a fraud election you you're not on our side. And yeah
> so I was angry too, yeah.

White went on to describe a verbal exchange with police, explaining that during the intense

violent melee inside the Tunnel, she berated an officer for not upholding the Constitution:

> You have to understand, it's like a mass of people. Um, a lot of
> people crammed together and, ya know, the police are right there
> and they were like spraying everyone, like macing them, and then,
> um I look at a police officer and I'm like, "You took an oath to the
> Constitution!" and apparently that didn't sit so well with him and he
> decided to hit me really hard on the head with the, a metal um baton.

In the many statements she has made and interviews she has given since, White has

expressed no remorse for the violence she participated in toward the officers present that day nor

the damage caused.  Rather, she has made it abundantly clear that she does not believe she has

done anything wrong.  For example, in August 2021, on the topic of her potential criminal

prosecution, White posted on social media, "I know the tactics and see daily how a corrupt judicial

system works. With the trumped up charges I'm facing I know that my future doesn't look bright.

*Not because of anything I've done*, but because I'm to be made an example of with lies." (emphasis

added).  In December, White reiterated the same sentiment when interviewed in a news article,

stating, "I didn't do anything wrong."

In January 2023, the parties scheduled a change of plea hearing before the Court for

February 2023.  *See* Minute Entry 1/13/2023.  However, prior to the hearing, White travelled to

Washington D.C. in violation of her pretrial release conditions and spent multiple days meeting

with other January 6 defendants and their families and attending vigils at the jail.  On Monday,

February 6, 2023, White posted on social media that she was "in DC this week" and that she had

a court appearance on Friday.  However, in text messages that were reported in a news article,

White stated she would not be entering a plea and that she actually "never wanted to take [a plea]

in the first place." White continued to tout her innocence into March 2023, when she gave an interview on an audio podcast where she again stated she was victimized by police brutality on January 6, denied her guilt, and questioned the integrity of the judicial process because "every single [January 6 defendant] has been found guilty." To date, it does not appear that White has ever publicly accepted responsibility or expressed any remorse for her actions.

### III.   THE CHARGES AND PLEA AGREEMENT

In September 2021, a federal grand jury charged White with several offenses in connection with her actions on January 6, 2021. On January 26, 2022, the grand jury returned a superseding indictment charging White with four counts, including, (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), (2) Entering in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), (3) Disorderly Conducted in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), and (4) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D). On, August 17, 2023, White was convicted of Count 1, Civil Disorder, based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

White now faces sentencing on felony Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to five years imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).  The plea agreement and the PSR are in agreement on the Guidelines calculations in this matter.

Count One: 18 U.S.C. § 231(a)(3)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | | -2 |
| | | **Total** | **8** |

PSR ¶ 48.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 54. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, White's Guidelines imprisonment range is 0 to 6 months' imprisonment.  White's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(C) of this memorandum, White's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Amongst a large crowd of people, White marched from the Washington Monument to the United States Capitol, where she approached the Lower West Terrace shortly before 4:00 p.m.  Pushing her way through the crowd, she engaged in a physical fight with other rioters, before forcing herself through the crowd toward her ultimate goal: the Lower West Terrace Tunnel.  White watched as an angry mob threw themselves against the police line in the Tunnel,

18

and used weapons such as a shield and flagpole against the officers inside. After seeing this, she boosted a fellow rioter up and over the crowd so he could kick at the officers. Despite clear signs that she should not enter the Tunnel, White forced her way into the space where she was ultimately subdued, pulled through the area, and arrested. The nature and circumstances of White's offense were of the utmost seriousness, and fully support the government's recommended sentence of three months' imprisonment.

**B. The History and Characteristics of the Defendant**

White is a 41-year old woman from Rochester, Minnesota. PSR ¶¶ 59, 84. White has a significant criminal history, and this conviction is not the first time she has been convicted for assaultive and disorderly conduct.

Beginning in 2006, White was charged with multiple counts of Assault and Disorderly Conduct. She ultimately pleaded guilty to assault and received a probationary sentence. PSR ¶ 50. One year later, she was charged with Damage to Property with a Foreseeable Risk of Bodily Harm for ramming her significant other's vehicle. PSR ¶ 51. She again pled guilty and received a probationary sentence with 30 days incarceration. *Id*. In 2008 and 2013, White was charged with drunk driving related offenses. PSR ¶¶ 52-53. She pled guilty to both offenses. *Id.*

Moreover, in the present matter, White was placed on pretrial supervised release on April 8, 2021. PSR ¶ 13. Among other conditions, White was ordered to remain law abiding and to stay away from Washington D.C., except for court appearances and meetings with her attorney. *Id*. On December 20, 2022, the Probation Office filed a supervised release violation report indicating that White had again been charged with Domestic Assault and Disorderly Conduct in Minnesota. PSR ¶ 14. The outcome of that matter is still pending. *Id*. Less than two months later, the Probation Office filed another violation report, this time alleging that White had violated the terms

of her stay-away order by traveling to Washington D.C. to meet with the families of other January 6 defendants and to meet with members of Congress.  PSR ¶ 15.  As a result of the violation, White was ordered to stay away from the United States Capitol and to not come into the city absent specific permission from pretrial services.  PSR ¶ 16.

White's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a series of convictions for violent and assaultive conduct.  White's history and characteristics, including her history of arrest and convictions weigh heavily in favor of a term of incarceration.

**C.**     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. White's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.**     **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a three month term of incarceration.

White's conduct on January 6, and her words following January 6, show a clear premeditated intent to commit the crime for which she has been convicted. Her behavior on that day shows that she made a conscious decision to go from merely protesting, to actively impeding police officers as they attempted to protect and clear the Capitol from a riotous mob. After January 6, White did not express remorse for actions. Instead, she repeatedly minimized her conduct and the conduct of the other violent rioters around her. She continuously held herself out as a victim, despite the fact that she repeatedly injected herself into the violent fray in and around the Tunnel when she easily could have turned around. Those statements, combined with White's own conduct on January 6, demonstrate that her sentence must be sufficient to provide specific deterrence from committing future crimes in furtherance of her political goals.

### F.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* At 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. At 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. At 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Lewis Cantwell travelled from North Carolina to Washington D.C., attended the "Stop the Steal" rally, and walked with hundreds of other protestors towards the Capitol building from the West. *See United States v. Cantwell*, No. 21-CR-89 (EGS), ECF. No. 49. Similar to White, Cantwell approached the Lower West Terrace, where he joined a mob of people forcing themselves into the Tunnel. Though Cantwell did not engage in direct combat with the police, he encouraged other rioters in the Tunnel, helped propel a flagpole into the Tunnel, and was a member of the mob that used its collective body weight to push against the police officers – yelling "heave ho" while doing so. Similar to White, in the aftermath of January 6, Cantwell minimized his actions and expressed no remorse. Like White, Cantwell pled guilty to a violation of 18 U.S.C. § 231(a)(3). Judge Sullivan sentenced Cantwell to 5 months' imprisonment and 36 months' supervised release.

Christian Cortez travelled from Texas to Washington D.C. with a friend to attend the "Stop the Steal" rally. *See United States v. Cortez*, No. 21-CR-317 (TSC), ECF. No. 71. He subsequently joined the crowd as it marched to the Capitol grounds, approached the building via the Upper West Terrace, and ultimately entered the Capitol amongst a large group of people. *Id*. at 2. Cortez left the building at the instruction of police officers, but remained on the Capitol grounds, immediately outside the North Doors, where he and other rioters attempted to prevent officers from securing the doors. Cortez did not engage in a physical fight with officers, but encouraged other rioters to hold their positions, screamed at the police officers, and slammed a large flagpole on the ground. Cortez pled guilty to a violation of 18 U.S.C. § 231(a)(3). Judge Chutkan sentenced Cortez to 4 months' imprisonment and 36 months of supervised release. No. 21-CR-317 (TSC), ECF. No. 78.

Regardless, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." Id. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that White must pay $2,000 in restitution, which reflects in part the role she played in the riot on January 6.[6] Plea Agreement at ¶ 12.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of May 2021. *Id.* (As noted above, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  White's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of four months' imprisonment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Allison K. Ethen*
CHRISTOPHER D. AMORE
ALLISON K. ETHEN
Assistant United States Attorneys
Capitol Siege Detailees
N.Y. Bar No. 5032883
M.N. Bar No. 0395353
601 D Street, N.W.
Washington, D.C. 20579
Allison.Ethen@usdoj.gov

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).